FILED
2013 MAR 26 P 4:05
CLERK
U.S. BANKRUPTCY
COURT - PGH

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | | |
| | : | |
| DAVID G. OBERDICK, | : | Case Number 08-20434-TPA |
| *Debtor* | : | |
| | : | Chapter 7 |
| ROBERT SHEARER, TRUSTEE, | : | |
| *Plaintiff* | : | Adv. No. 08-2155 |
| | : | |
| v. | : | |
| | : | |
| DAVID G. OBERDICK and | : | |
| SALLY OBERDICK, | : | |
| *Defendants* | : | |

...................................................................................................................................................

| | | |
|---|---|---|
| TRIZECHAHN GATEWAY, LLC | : | |
| *Movant* | : | |
| | : | |
| v. | : | Related to Doc. No. 19 (main case) |
| | : | |
| DAVID G. OBERDICK, | : | |
| *Respondent.* | : | |

*Appearances:*  John P. Vetica, Jr. for Plaintiff, Robert Shearer, Trustee/Movant TrizecHahn Gateway, LLC
Scott M. Hare for Defendants/Respondents, David G. Oberdick and Sally Oberdick

## <u>MEMORANDUM OPINION</u>

### *INTRODUCTION*

This adversary proceeding and the related objection to exemptions are part of a series

cases informally known to the Court as the "Titus" cases[1] because they all involve certain attorneys

---

[1]    *See*,  *In re Paul H. Titus*, Case No. 10-23668 and *Böhm v. Titus*, Adv. No. 10-2338; *In re Thomas D. Arbogast*, Case No. 10-20237 and *Cardiello v. Arbogast*, Adv. No. 10-2092;  *In re  Thomas C. Wettach*, Case No. 05-38188 and *Sikirica v. Wettach*, Adv. No. 07-2519; and *In re David I. Cohen*, Case No. 05-38135 and *Sikirica v. Cohen*, Adv. No. 07-2517.  T&M  was itself also a debtor in this Court.  *See In re Titus & McConomy, LLP*, Case No. 03-25332, closed on November 29, 2007.

who were partners in the former Pittsburgh law firm of Titus & McConomy, LLP (T&M").  T&M and some of its partners individually, were sued for breach of a lease agreement by TrizecHahn Gateway, LLC ("Trizec"), which ultimately secured a joint and several judgment against T&M and the partners.  Trizec then began pursuing execution on the judgment and some of the partners ended up in bankruptcy, either voluntarily or involuntarily.  The issues raised in the Titus cases revolve around allegations of fraudulent transfer in connection with the disposition of the partners' post-T&M earnings vis-a-vis the Trizec judgment.

All of the Titus cases were originally assigned to the Hon. M. Bruce McCullough, and upon his death in late 2010 they were reassigned to the Hon. Bernard Markovitz.  Judge Markovitz conducted trials in all of the Titus cases during 2011, including the present matter which was tried on June 15, 2011, and he actually issued memorandum opinions in two of those cases.  *See*, *In re Arbogast*, 466 B.R. 287 (Bankr. W.D. Pa. 2012), aff'd., 479 B.R. 661 (W.D. Pa. 2012) and *In re Titus*, 467 B.R. 592  (Bankr. W.D. Pa. 2012), motion to amend *denied* by 479 B.R. 362 (Bankr. W.D. Pa. 2012).  Before he could render  decisions in the remaining Titus cases, however, Judge Markovitz retired from the bench and those cases were reassigned to the Undersigned.[2]

Upon being assigned the Titus cases, the Court was  somewhat uncertain as how best to proceed with respect to the matters for which Judge Markovitz had conducted trials, but not yet issued decisions at the time of his retirement.  The Court initially thought the matters might need to be retried.  However, at a *Status Conference* held on March 26, 2012 the Parties in the affected Titus

---

[2]        The *Cohen* matter was subsequently transferred to the Hon. Jeffery A. Deller on July 13, 2012, and he has issued a decision in that case.  *See*, *In re Cohen*, 2012 WL 5360956 (Bankr. W.D. Pa. 2012), affirmed in part, vacated in part, remanded by 2013 WL 772705 (W.D. Pa. Feb. 28, 2013).

cases all consented to the Court making findings of fact and conclusions of law based solely on its

review of the pleadings, post-trial briefs, trial transcript and exhibits. *See*, Order of March 27, 2012,

Adv. Doc. No. 133.  Pursuant to *Fed.R.Bankr.P. 7052*, the within *Memorandum Opinion* sets forth

the Court's findings of fact and conclusions of law as to the pending matters following such review.[3]

        For the reasons set forth below, the Court finds in favor of the Defendants and against

the Trustee  on the Trustee's fraudulent transfer action. The Court will also sustain, in part, and

overrule, in part, the objections to exemption made by Trizec.

### STATEMENT OF FACTS

        The Debtor, David Oberdick,  is an attorney who at one time was a partner of T &

M. The other Defendant is Sally Oberdick, the wife of the Debtor.  T&M rented office space in a

building owned by Trizec.  On July 28, 2000 Trizec filed a lawsuit against T&M and some of its

partners in the Pennsylvania Court of Common Pleas for Allegheny County (hereafter "the Common

Pleas Court"). Trizec filed such lawsuit (hereafter "the Lease Litigation") on the basis that T&M had

breached its lease agreement with Trizec. Trizec named as defendants in the Lease Litigation

approximately 20 individual partners of T&M,  including the Debtor.

---

[3]        These are core matters under  *28 U.S.C. §157(b)(2)(A)* and *(H)*.  The  Court's jurisdiction to hear and decide these matters under *28 U.S.C. §1334* was not disputed,  nor did any party challenge the Court's power to render this decision on the basis of the holding in *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011).  The Court concludes that it has the constitutional authority to enter a final judgment in these matters, or that in the alternative the parties have consented to the entry of a final judgment. *See*, *In re River Entm't. Co.*, 467 B.R. 808, 822- 825 (Bankr. W.D. Pa. 2012). Finally, if it is determined that the Court does not possess the authority to enter a final judgment, it does have the authority to submit proposed findings of fact and conclusions of law to the District Court and this *Memorandum Opinion* should be construed as such.

On June 7, 2006, the Common Pleas Court entered a joint and several judgment in the Lease Litigation in favor of Trizec and against certain of the defendants, including the Debtor. The base amount of such judgment was approximately $2.7 million. The Lease Litigation judgment was subsequently appealed to the Pennsylvania Superior Court, which affirmed the Common Pleas Court's decision on July 3, 2007, as to most of the named defendants, including the Debtor. *See*, *Trizechahn Gateway, L.L.C. v. Titus*, 930 A.2d 524 (Pa. Super. Ct. 2007), *rev'd in part & remanded*, 601 Pa. 637, 976 A.2d 474 (2008).

In an attempt to collect on such judgment from the Debtor, Trizec commenced a fraudulent transfer action on April 23, 2007, against the Debtor and Mrs. Oberdick in the Common Pleas Court at No. GD-07-8501 (hereafter "the Oberdick FTA"). On January 23, 2008, the Debtor commenced the present bankruptcy case by filing a voluntary Chapter 7 petition.

The Debtor then removed the Oberdick FTA to this Court on April 22, 2008, thereby initiating the present adversary proceeding. After the Parties engaged in litigation of some preliminary matters, Trizec filed an *Amended Complaint* on February 14, 2010. *See* Adv. Doc. No. 45. The Trustee was substituted for Trizec as Plaintiff on April 22, 2010. *See* Adv Doc. Nos.56 and 60.

The *Amended Complaint* contains three counts under the Pennsylvania Uniform Fraudulent Transfer Act ("PaUFTA"). Count I pleads an action for actual fraudulent transfer under *12 Pa.C.S.A. § 5104(a)(1)*), Count II pleads constructive fraudulent transfer under *12 Pa.C.S.A. § 5104(a)(2)(ii)*, and Count III also pleads constructive fraudulent transfer, this time under *12*

4

Pa.C.S.A. *§5105*.[4]  The Trustee is authorized to pursue the Oberdick FTA pursuant to *11 U.S.C.*

*§544(b)(1)*, which allows a bankruptcy trustee to "avoid any transfer of an interest of the debtor in

property ... that is voidable under applicable [nonbankruptcy] law by a creditor holding an unsecured

claim [against said debtor's bankruptcy estate]."

The gravamen of the Oberdick FTA as set forth in the *Amended Complaint* is that the

Debtor engaged in fraudulent transfers when, subsequent to the initiation of the Lease Litigation in

July 2000, he deposited his individual earnings from the law firm of Meyer, Unkovic & Scott, LLP

("MUS")  (where he has worked, first as a partner and then as an employee, since T&M was

dissolved),  into a PNC Bank checking account that he jointly owned with Mrs. Oberdick in a

tenancy by the entireties (hereafter "the Entireties Account").  This was done primarily through the

means of an electronic direct deposit. The contention is that such deposits constituted "transfers"

under *PaUFTA*, and that such transfers by the Debtor were fraudulent, either actually or

---

[4]     *12 Pa.C.S.A. §§ 5104(a)(1)* and *(2)(ii)* provide, in pertinent part, that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the
creditor's claim arose before or after the transfer was made or the obligation was incurred, if
the debtor made the transfer or incurred the obligation:

(1)  with actual intent to hinder, delay or defraud any creditor of the
debtor; or

(2) without receiving a reasonably equivalent value in exchange for the
transfer or obligation, and the debtor:
...

(ii) intended to incur, or believed or reasonably should have
believed that the debtor would incur, debts beyond the debtor's
ability to pay as they became due.

*12 Pa.C.S.A. §5105* provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim
arose before the transfer was made or the obligation was incurred if the debtor made the
transfer or incurred the obligation without receiving a reasonably equivalent value in
exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor
became insolvent as a result of the transfer or obligation.

constructively because they had the effect of shielding the Debtor's individual compensation from the reach of his creditors, such as Trizec, by converting it into entireties property.

The Trustee seeks a variety of relief in the Oberdick FTA, including a judgment against both the Debtor and Mrs. Oberdick for the amount of the transfers to be avoided as fraudulent, pursuant to *11 U.S.C. §550(a)(1)*. That provision states, in pertinent part, that "to the extent that a transfer is avoided under section 544, ... the trustee may recover, for the benefit of the estate, the property transferred, or ... the value of such property, from ... the initial transferee of such transfer or the entity for whose benefit such transfer was made." *11 U.S.C.A. §550(a)(1)*. The theory for the requested relief is that, because the Debtor transferred his individual compensation into the Entireties Account, and since both the Debtor and Mrs. Oberdick jointly owned such account, the Debtor and Mrs. Oberdick both constitute initial transferees of such transfers (and thus the entity for whose benefit such transfers were made as well).

The Trustee relies heavily on the decision in *In re Meinen*, 232 B.R. 827, 840–43 (Bankr.W.D. Pa. 1999) for his position that the Debtor's periodic transfers of his solely-earned individual compensation into the Entireties Account constituted fraudulent transfers. The *Meinen* decision and the cases cited therein do indeed generally support the Trustee's position, provided that such deposited compensation was not then utilized to satisfy reasonable and necessary household expenses for the maintenance of the Debtor's family.

In addition to and separate from the Oberdick FTA, on April 1, 2008, Trizec, as a prepetition creditor, filed ***Objections to Debtor's Exemptions*** ("Objections"), Main Doc. No. 19, in which it objected to the Debtor's claimed exemptions in the Entireties Account, a Charles Schwab

6

IRA, a 401(k) account maintained through MUS, and "wages" due the Debtor from MUS for 2006. The Trustee has not joined in the *Objections*. Subsequently, on April 14, 2011, TRZ Holdings, LLC ("TRZ"), rather than Trizec, filed a proof of claim in the case, in the amount of $2,798,209.19, naming itself as the creditor to whom the Debtor owes the joint and several Lease Litigation judgment. *See Proof of Claim 2-1*. TRZ claims that it is the entity to whom the Debtor owes such judgment on the basis that it is the successor in interest to Trizec. The Court will treat TRZ as being the proper creditor to whom the Debtor owes the joint and several Lease Litigation judgment, and refer to TRZ and Trizec interchangeably. On January 6, 2011, Judge Markovitz conducted a Status Conference on the *Objections* and directed that they be tried together with the Oberdick FTA. *See* Main Doc. No. 73.

Although the *Objections* originally covered five separate items of personal property interests disclosed on the Debtor's petition, Trizec has now narrowed them down to two. First it objects to the exemption of certain contributions that were made for the benefit of the Debtor to a 401(k) profit sharing plan by MUS. The Debtor has scheduled this plan as an exempt "pension or annuity" pursuant to *42 Pa. C.S. §8124(b)(1)(ix)*. Trizec contends that the challenged contributions may have been the result of fraudulent transfers. *See Objections* at ¶9(e). Second, Trizec objects to the exemption of certain funds being held in a partnership account by MUS which the Debtor has scheduled as "wages" that are exempt pursuant to *42 Pa. C.S. §8127*. Trizec contends that the funds in question do not qualify as wages.

As to the amounts that are at issue, the post-trial brief filed following the June 15, 2011 trial includes the following summary of the "damages" being sought by the Trustee in the

7

Oberdick FTA and by Trizec in the *Objections*:

| | |
|---|---|
| Payments for education of Defendants' minor children | $ 82,536.00 |
| Payments for entertainment/travel | 7,000.00 |
| Retirement fund contributions | 38,443.00 |
| Checks not produced | 101,352.00 |
| Checks drawn to cash | 28,500.00 |
| MUS "wages" | 70,707.00 |
| Total | $328,538.00 |

Adv. Doc. No. 114 at 18. It may be seen that the first, second, fourth and fifth items arise under the

Oberdick FTA, while the third and sixth items are under the *Objections*.

In response to the Oberdick FTA, the Defendants raise a number of defenses. For

instance, they contend that none of the direct deposits by MUS into the Entireties Account

constitute fraudulent transfers pursuant to either *§5104(a)(1)*, *§5104(a)(2)(ii)*, or *§5105*, pointing out

that the Debtor has historically deposited his individual compensation into the Entireties Account

since the inception of the Defendants' marriage in 1984 for the purpose of meeting ordinary and

necessary living expenses. Defendants argue that nothing in this practice changed following the

entry of the judgment in the Lease Litigation, negating any fraudulent intent. The Defendants say

that the Debtor's receipt of a discharge in this case has undermined the basis for the fraudulent

transfer claims. The Defendants also urge the Court to adopt the law as stated by the Common

Pleas Court in the Oberdick FTA prior to its removal to this Court, wherein it was held that the

direct deposits of the Debtor's individual compensation into the Entireties Account only constitute

fraudulent transfers to the extent that they were spent on luxuries, and even to the extent that such

deposits were spent on luxuries, thereby making them fraudulent transfers, they would only be

recoverable from Mrs. Oberdick if she is the one who actually spent such deposits and the luxury

purchases actually benefitted her.

With respect to the *Objections*, the Debtor argues that the MUS 401(k) profit sharing plan is a qualified plan which does not constitute property of the bankruptcy estate pursuant to *11 U.S.C. §541(c)(2)* because it includes an anti-alienation provision enforceable under applicable non-bankruptcy law.  He also argues that the plan is exempt under Pennsylvania statutory law.  As to the MUS "wages" being held in a partnership account, the Debtor argues that Trizec has waived this objection by failing to list the objection in the pre-trial statement.  If the objection has been preserved, the Debtor argues that the funds in question qualify as exempt wages.

## *DISCUSSION*

There are a fair number of issues to be resolved before a final decision can be reached.  The Court will address them in what it hopes is a systematic manner, beginning with the Oberdick FTA and some "preliminary" motions related thereto that have yet to be resolved.

### *A.    Oberdick FTA*

### *A. (1)    Rule 52(c) Motions for Judgment on Partial Findings*

At the close of the Plaintiffs' case at the  trial conducted on June 15, 2011, the Defendants made four oral motions for judgment on partial findings pursuant to *Fed.R.Civ.P. 52(c)*[5].

---

[5]    *Rule 52(c) is incorporated into the procedure of adversary proceedings pursuant to Fed.R.Bankr.P. 7052*, and it provides:

> (c)   **Judgment on Partial Findings**. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

*See Transcript of the Trial of June 15, 2011* at p. 71, l. 5 *et. seq*., Adv. Doc. No. 115 (hereafter, "*Tr.*

*Tran. at ___*").   Judge Markovitz allowed Counsel for the Defendants to state the substance of the

motions, but indicated that he would be "taking these all under advisement." *Tr. Tran*. at 73, l. 7-8.

After making the oral motions, the Defendants then proceeded to put on their case, "without waiving

our motions for non-suit." *Id.* at 78, l. 20-22.  Judge Markovitz  never ruled on these motions.

As is clear from the plain language of the *Rule 52(c)* itself, Judge Markovitz acted

within his available discretion in taking the motions for judgment on partial findings under

advisement.  *See, e.g.*, *EBC, Inc. v. Clark Bldg. Systems, Inc*., 618 F.3d 253, 272 (3d Cir. 2010)

(court presented with a *Rule 52(c)* motion may opt to reserve judgment until all of the evidence is

in).  The question thus arises–when the motions are now considered, should they be decided based

on the state of the record as it existed at the time they were made, or the state of the record now,

after the full trial?  The answer seems to be the latter.  *See, e.g., Duval v. Midwest Auto City, Inc.*,

578 F.2d 721, 723-24 (8th Cir. 1978) (once a defendant introduces evidence on its own behalf,

sufficiency of evidence is tested on appeal by reviewing the entire record, even when the trial judge

reserved ruling on the motion when made);  *Gaffney v. Riverboat Svcs. of Ind., Inc*., 451 F.3d 424,

451 (7th Cir. 2006) (rejecting argument that evidence should be evaluated as of the time the motion

was made);  *S.E.C. v. Razmilovic*, 2011 WL 4629022 (E.D.N.Y. 2011) (same);  *In re Sears*, 246 B.R.

341, 346 (8th Cir. BAP 2000).  The Defendants were clearly informed by Judge Markovitz that he

was going to be taking the motions under advisement.  *See Tr. Tran*. at 73, lines 7-9.  Knowing that,

they nevertheless elected to put on a case.  Their attempt to do so without waiving the "Motions for

Non-Suit" is not effective to prevent the Court from now considering the entire record because it is

well-recognized a court has the discretion to do so once the defense presents evidence, thereby

10

effectively denying the Rule 52(c) motions.  *See, e.g., McDermott v. Marcus, Errico, Emmer & Brooks, P.C.,* 2012 WL 5878665 (D. Mass. 2012); *W.L. Gore & Assoc. Inc. v. Medtronic, Inc.,* 2012 WL 2308651 (E.D. Va. 2012); *Warner Chilcott Labs. Ireland, Ltd. v. Impex Labratories, Inc.*, 2012 WL 1551709 (D. N.J. 2012).

Since the Court will consider the entire record, decisions on the four unresolved motions at this point would be tantamount to making a decision on the case after trial on the complete trial record, as if no such motions had ever been made.   It is thus pointless to separately consider the motions, and in any event the same arguments raised by the Defendants in the motions can and will be addressed by the Court in the course of rendering a decision after a full trial.   The four *Rule 52(c)* motions are therefore denied.

### A. (2)    Timeliness of Trustee's Intervention

In the contested issues of law listed in their portion of the pretrial narrative statement, the Defendants contend that the Oberdick FTA should be dismissed because the Trustee's intervention did not occur within the time limit required under *11 U.S.C. §546(a)(1)*, which states:

> (a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of–
>
> (1) the later of--
>
> (A) 2 years after the entry of the order for relief; or
>
> (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
>
> (2) the time the case is closed or dismissed.

*11 U.S.C. §546(a)(1).* The adversary proceeding was initiated on April 22, 2008, when the Debtor removed the Oberdick FTA from state court to this Court. That was done only 3 months after the bankruptcy case was opened. However, Trizec was the Plaintiff in this matter at the time of the removal. It was not until April 20, 2010, that the Trustee filed a motion seeking to be substituted as Plaintiff (in response to a motion to dismiss filed by the Defendants), and it was not until April 22, 2010 that the motion was granted and the Trustee was substituted as Plaintiff. *See* Adv. Doc. Nos. 56, 60.

Thereafter, the Defendants filed a motion to reconsider the substitution of the Trustee, arguing the same timeliness issue presently under discussion. After the Trustee responded to that motion, however, and before the argument date which the Court had set, the Defendants unilaterally withdrew their motion for reconsideration. *See* Adv. Doc. Nos. 62, 64, 65, 67.

The Order granting the Trustee leave to be substituted as the Plaintiff is the law of the case. While an earlier order issued in a case can be revisited under certain circumstances even though it represents the law of the case, the Defendants have provided no good reason why that should be done here. Furthermore, by previously raising the timeliness issue in the motion for reconsideration, and then voluntarily withdrawing that motion before it was ruled upon, the Defendants have arguably waived any issue as to timeliness under *Section 546(a)*. The Court is not inclined to revisit this issue under the circumstances.

Assuming, *arguendo*, that there has been no waiver, the Court would nevertheless reject the argument of the Defendants. The two-year provision under *Section 546(a)* is in the nature of a statute of limitations and is not jurisdictional. *See, e.g., In re Pugh*, 158 F.3d 530, 534-36 (11th

12

Cir. 1998).  The purpose of the provision is to bring finality to an issue and to prevent stale claims

from being pursued .  *McCuskey v. Cent. Trailer Servs., Ltd.*, 37 F.3d 1329, 1333 (8th Cir. 1994).

Neither of those purposes would be served here by a finding that the Trustee was time-barred from

pursuing the case.  The Oberdick FTA actually predates the filing of the Debtor's bankruptcy case.

The Trustee did not start a new action beyond the two-year period provided under *Section 546(a)*,

he merely moved to be substituted as Plaintiff because after the bankruptcy filing he became the real

party in interest to be pursuing the case rather than Trizec.    In these circumstances, it would elevate

form over substance to find that the case was time-barred.  Neither the *Rules* nor applicable case law

require such result.  *See, e.g.*, *Fed.R.Bankr.P. 7017*, incorporating *Fed.R.Civ.P. 17(a)(3)* (after

substitution of real party in interest, the action proceeds as if it had been originally commenced by

the real party in interest); *In re Levine*,  2007 WL 2048670 (Bankr. S.D. N.Y. 2007).


### A. (3)    Debtor's Discharge


The Defendants also argue that any liability that the Debtor may have had in the

Oberdick FTA has been extinguished because he received a discharge in his Chapter 7 case on

January 15, 2010.  *See* Main Case Doc. No. 41.   Judge Markovitz addressed this same issue in the

*Titus* and *Arbogast* decisions and explained that the pursuit of a fraudulent transfer action by a

bankruptcy  trustee pursuant to *11 U.S.C. §544(b)(1)* transforms the matter into a bankruptcy cause

of action.  Because a bankruptcy cause of action can only be brought post-petition, this case is

necessarily not a pre-petition claim and was therefore not extinguished by the Debtor's discharge.

*See*, *Titus*, 467 B.R. at 611-12;  *Arbogast*, 466 B.R. at 307.  *See also, Cohen v. Sikirica*, ___ B.R.

_____, 2013 WL 772705 (W.D. Pa. 2013) where the district court rejected an argument that the

13

debtor's discharge somehow extinguished a fraudulent transfer claim, holding that all that is required is that the same creditor hold a claim at the time of the alleged fraudulent transfer and at the time the complaint was filed.  The Court agrees with this conclusion and finds that the Debtor's discharge did not extinguish his potential liability in this case.  Furthermore, Trizec held a claim against the Debtor both when the alleged fraudulent transfers were made and when the complaint was filed.

### A. (4)   Count I of Oberdick FTA–Actual Fraud

The Court next finds that it can expeditiously render a finding as to Count I of the *Amended Complaint*, which alleges a claim based on an  actual intent to hinder, delay or defraud, pursuant to *12 Pa. C.S.A. §5104(a)(1)*.  The Trustee, as the party asserting the claim, bears the burden of proving such actual intent, though there is some uncertainty in the law as to whether the burden is by clear and convincing evidence, or only by a preponderance. *See*, *In re Lockwood Auto Group, Inc.*, 450 B.R. 557, 573 n. 14 (Bankr. W.D. Pa. 2011); *In re Cohen*, 2012 WL 5360956 *3 (Bankr. W.D. Pa. 2012).  As with any bankruptcy cause of action wherein intent is an issue, a determination concerning fraudulent intent depends largely on an assessment by the factfinder of the credibility and demeanor of the Debtor (and in this case of his wife as well).  *See,  Provident Bank v. Pandolfelli*, 2011 WL 5900809 (Bankr. D.N.J. 2011) (quoting *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir. 1997)).

In this instance, the Court is at a disadvantage because it was Judge Markovitz, not the Undersigned, who was present at the trial and thus in a position to assess witness credibility and demeanor.  In that regard, and in obvious anticipation of other opinions he was not able to complete

14

prior to his retirement, Judge Markovitz stated as follows in his opinion in the *Arbogast* matter with respect to all of the debtors involved in the Titus cases:

> Although the term "fraud" has been utilized throughout the litigation involving each of the attorneys, this Court concludes, without equivocation, that no basis exists to make any finding against any of them regarding actual fraud. To the contrary, the Court found there to be no question of credibility on their part in any of the adversary proceedings. Therefore, the decision that follows, as well as those that will follow, is directed primarily to the issue of constructive fraud without any implication of moral turpitude on the part of the attorneys.

456 B.R. at 293.

Subsequently in that opinion, Judge Markovitz further noted that with particular regard to the debtor in *Arbogast*, the evidence showed: (1) that he had been making deposits into an entireties checking account long before 2000 when Trizec began to pursue the Lease Litigation; (2) there was insufficient evidence at trial to show that he continued these deposits after the commencement of the Lease Litigation so as to avoid Trizec's reach;  and, (3) no evidence was produced to establish that before Trizec initiated the fraudulent transfer action the debtor was even aware that the direct deposits could constitute fraudulent transfers.  *Id.* at 313.  Thus, even though a number  of  "badges of fraud" as set forth in *12 Pa. C.S.A. §5104(b)(1)* were present in the case, Judge Markovitz found that  was not enough to meet the plaintiff's burden of proof as to an actual intent to hinder, delay or defraud.  Judge Deller came to a similar conclusion in *Cohen*.  *See*, 2012 WL 5360956 *4.

While the Court does not believe that  any of the conclusions of law or findings of fact made by Judge Markovitz in *Arbogast* are binding in the present case, as to this particular matter it finds that the best course is to defer to Judge Markovitz's credibility assessment  as expressed in

15

the quotation reproduced above from the opinion in *Arbogast*.  Furthermore, the same additional

reasons cited by Judge Markovitz in *Arbogast* for finding that an actual intent claim had not been

proven in that case are also present here.

       The evidence presented at trial in the present case showed that the Debtor had been

depositing his pay into the Entireties Account since he and his wife  were married in 1984 – some

16 years before the start of the Lease Litigation.  There was no evidence to show that the Debtor

continued to make the deposits after the Lease Litigation began out of an intent to defraud creditors,

nor that the Defendants were even aware before the Oberdick FTA was filed that such deposits could

constitute fraudulent transfers.  As in *Arbogast* and *Cohen*, any badges of fraud under *Section

5104(b)(1)*  that might arguably be present here are not sufficient to overcome these facts and carry

the Trustee's burden of proof. Thus, the Court finds in favor of the Defendants as to Count I and will

proceed to consider the remaining Counts II and III of the *Amended Complaint* alleging constructive

fraudulent transfer.

### A. (5)    *Counts II and III of Oberdick FTA--Constructive Fraudulent Transfer*

       The Court next turns to a consideration of Counts II and III of the *Amended

Complaint*, alleging claims of constructive fraudulent transfer.  In doing so, the Court will apply the

following approach to the allocation of the burden of proof that was adopted by the bankruptcy court

in the *Cohen* case, and affirmed on appeal:

> Trustee must prove by the preponderance of the evidence that (1) the
> Debtor failed to receive reasonably equivalent value in exchange for
> the direct deposits of his wages in to the Entireties Account, and, (2)
> he was either insolvent at the time of, or was rendered insolvent by,

16

> such transfers.  However, the Court will impose on the defendants the
> burden of producing at least some useful evidence to demonstrate
> how they spent the deposited funds.  Absent the production of some
> evidence, the Trustee will be deemed to have met his burden of proof.

2012 WL 5360956 at *7 (as quoted in 2013 WL 772705 *2).[6]  As will be seen, the concept of "reasonably equivalent value" encompasses a number of separate inquiries, including other sources of deposit into the Entireties Account and the use of expenditures from that Account.  As each succeeding issue is discussed, it should be understood that the Court's finding is premised on the above burden of proof, even if not explicitly so stated.

### A. (5)(a)    Insolvency/Failure to Pay Debts as They Come Due

The statutes upon which the Trustee relies are conditional and do not apply to every transfer.  Under *12 Pa.C.S.A. §5104(a)(2)(ii),* the Trustee must show that the Debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  Under *12 Pa. C.S.A. §5105* the Trustee must show that the Debtor was insolvent at the time of the transfers, or was rendered insolvent as a result of the transfers.  In other words, if the Trustee fails to show the existence of these conditions he cannot

---

[6]    Judge Markovitz, departing from the holding in *Meinen* on that particular point, and based on Committee Comment 6 to *12 Pa. C.S.A. §5102,* "reluctantly" held that the Trustee, as part of a *prima facie* case where reasonably equivalent value was not returned, had the burden of proving that the deposits either were not used to satisfy necessities or were spent on other assets that are presently held as entireties property. *Arbogast*, 466 B.R. at 308.  This Court understands the reluctance of Judge Markovitz as to the burden of proof he adopted because it also has concerns about that approach for several reasons.  For one, it does seem that the most apt comparison for funds spent on necessities as a means of avoiding an otherwise fraudulent transfer liability is that of an affirmative defense, which would typically mean a burden placed on the party asserting the defense.  In this instance, that would correspond to the Defendants, who are also clearly in the best position to show where expenditures from the Entireties Account went.  Nevertheless, the approach adopted by Judge Markovitz was affirmed on appeal, *see* 479 B.R. at 666, and the Court will therefore follow it here.

prevail even if transfers within the scope of the statute occurred. It therefore makes sense to first examine whether the Trustee has proven the existence of these conditions, and only then, if necessary, to turn to other questions surrounding the transfers.

The Defendants argue that insolvency has not been proven because the Trustee failed to offer any evidence showing insolvency based on a failure to pay debts as they came due or through a balance sheet test. They also argue that the Trustee was required to do more than generally assert insolvency based on the Trizec debt itself, which was not reduced to judgment until June 7, 2006.

The Court would certainly agree with the Defendants that the Trustee did not prominently feature the insolvency issue in his case-in-chief – in fact the word was not even mentioned. However during the Defendants' case the Trustee did elicit an admission from the Debtor that all of the assets  he had listed in Schedule B of his petition were either owned by the entireties or were exempt under non-bankruptcy law, such that he had no assets as defined under *PaUFTA*. *See Tr. Tran.* starting at 175, l. 18. Additionally, the Debtor's compensation from MUS could not be counted as an asset for purposes of an insolvency analysis because such compensation is itself the subject of this action. *See 12 Pa.C.S.A. § 5102(d)* (assets do not include property that has been transferred in a manner making the transfer fraudulent under *PaUFTA*), quoted in *Cohen*, 2012 WL 5360956 at *8.

The Debtor, however, resisted agreeing to the conclusion that he was therefore insolvent when the transfers at issue were made, arguing that he had as a non-scheduled  asset an indemnity claim against his former T&M partners. This indemnity claim was based on the T&M

18

"Plan of Liquidation," dated August 18, 1999, pursuant to which the T&M partners had agreed to indemnify and hold each other harmless to the extent that any partner paid more than his or her "liquidating percentage" to satisfy a debt of the partnership.  Trustee's Exhibit 1 at ¶12.  The Debtor did not dispute the Trustee's assertion that no such indemnity claim had actually accrued yet because he has not paid anything to Trizec, but he stated he believed the claim should still be counted for purposes of a balance sheet analysis of insolvency.

It would have been helpful to have had expert accounting testimony on the question of whether this indemnity claim should be counted as an asset of the Debtor for purposes of balance sheet insolvency.  That, however, was not provided so the Court must address the issue as best it can based on general principles.  In that regard, the Court is inclined to agree with the Trustee that it should not be so counted because unless and until the Debtor pays something toward the Trizec debt beyond his liquidation percentage, the indemnity claim is more of a theoretical or inchoate asset than anything else.  The fact that many of the T&M partners have gone into bankruptcy and, presumably, discharged this indemnity obligation, further devalues it for purposes of an insolvency analysis.  Furthermore, even if the Court were to agree with the Debtor that the indemnity claim should be counted in its fullest possible value as an asset for purposes of an insolvency analysis, such asset would still be worth less than the Trizec liability because the Debtor would in no event ever  be entitled to recover his own liquidation percentage of the debt (6.6208%) from the other former T&M partners.

The Debtor has also raised a question of whether the Trizec debt itself should be counted as a liability for insolvency purposes since it was not reduced to judgment until the middle

19

of 2006.  Judge Deller dealt with this very issue in *Cohen* and concluded that the effective date of

the Trizec debt for insolvency purposes was July 2000, when the Lease Litigation was filed.  He

noted that *PaUFTA* provides that a "debt" is "liability on a claim," with claim defined broadly as

a "right to payment," to include even those that are unliquidated, or disputed, or not reduced to

judgment. 2012 WL 5360956 at *8*.  The Court agrees with that conclusion.  Thus, the Debtor was

insolvent for purposes of *PaUFTA* beginning in July 2000 and continuing at all relevant times

thereafter.


### A. (5)(b)    *What Constituted the "Transfer" under PaUFTA?*

In his post-trial brief, the Trustee says that for purposes of the case "the statutory

focus begins with the *transfer* itself."  Doc. No. 114 at 2 (emphasis in original).  The Court agrees

that is a key question since the Trustee can succeed on the remaining constructive fraudulent transfer

claims in the case only if, and to the extent that, he has proven the occurrence of a "transfer" within

the meaning of *PaUFTA*.

In *Meinen*, *supra*, the court held that "a debtor's deposit of his or her own funds into

a bank account owned jointly with his or her spouse as tenants by the entireties" constitutes a

"transfer" as that term is defined in *PaUFTA*.  232 B.R. at 840.  In reaching that conclusion, the

*Meinen* court relied on Pennsylvania  case law construing the predecessor statute to *PaUFTA*, the

Pennsylvania Uniform Fraudulent Conveyance Act, and found that it was equally applicable under

*PaUFTA* because:

> (a)   a "transfer" under the Pa. UFTA is "every mode, direct or indirect,
> absolute or conditional, voluntary or involuntary, of disposing of or parting

with an asset or an interest in an asset," *12 Pa.C.S.A. § 5101(b)* (Purdon's 1998) (definition of "transfer"), (b) an "asset" for purposes of the Pa. UFTA "does not include ... an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant," Id. (definition of "asset"), (c) entireties property in Pennsylvania "is unavailable to satisfy the claims of the creditor of only one of the tenants," *Garden State Standardbred,* 611 A.2d at 1243; *Stinner v. Stinner,* 300 Pa.Super. 351, 446 A.2d 651, 652 (1982) (citing *Patterson v. Hopkins,* 247 Pa.Super. 163, 371 A.2d 1378, 1382 (1977)), which means that entireties property in Pennsylvania does not constitute an "asset" under the Pa. UFTA, (d) the conversion by a debtor of his or her own property, which would constitute an "asset" of said debtor for purposes of the Pa. UFTA, into entireties property, which would not constitute such an "asset" of said debtor, is thus a means for said debtor to dispose of, or *841 part with, his or her own assets, which means that said conversion into entireties property constitutes a transfer of said debtor's property under the Pa. UFTA, and (e) a debtor, by depositing his or her own funds into an entireties bank account, is converting said funds into entireties property and, thereby, transferring said property for purposes of the Pa. UFTA.

232 B.R. at 840-41.

Judge Markovitz adopted this view in *Arbogast,* concluding that direct deposits of a debtor's individual compensation into an entireties account may constitute at least constructive fraudulent transfers, unless they were subsequently spent on necessities. 466 B.R. at 287. Judge Deller also reached the same conclusion in *Cohen,* finding that the direct deposit of debtor's compensation into an entireties account by his employer was equivalent to a transfer made by the debtor himself for purposes of *Sections 5104(a)* and *5105.* 2012 WL 5360956 at *5-6. This aspect of the *Cohen* decision was expressly affirmed by the district court. 2013 WL 772705 at *13. The Court here also finds *Meinen* to be persuasive and concludes that the direct deposits from MUS into the Entireties Account by MUS was a "transfer" for purposes of *PaUFTA.*

That having been established, the question turns to whether the Trustee has satisfactorily proven the occurrence of such transfers here. The Trustee apparently believed so,

having submitted in a post-trial filing the following proposed finding of fact:

(10)   From a period starting in April of 2003 through February of 2008, David Oberdick deposited at least $780,627.61 into the Entireties Account.

*Proposed Findings of Fact and Conclusions of Law Submitted by Plaintiff*, Adv. Doc. No. 125. Given the centrality of this "fact" to the Trustee's case, the Court began its review of the trial record assuming it would include high visibility proof of these deposits. That, however, did not prove to be true. Record evidence of the basic fact for the existence of, and especially the amount of any deposits by MUS regarding the Debtor's compensation into the Entireties Account, is actually quite elusive.

The Court's initial review of the record as to this issue resulted in an order dated July 3, 2012, Doc. No. 135, that explained the Court's difficulty in finding evidence in the record as to the deposits, and directed the Parties to submit briefs. The end result of that episode was that the Trustee filed a *Motion to Supplement Trial Record*, Doc. No. 143, through which he sought leave to submit Trustee's Exhibits 23 and 40 into the record, those being documents that would apparently provide clear and direct evidence as to the fact and amounts of the deposits into the Entireties Account.[7] For reasons which will not be repeated here, however, the Court has denied that Motion in a separate order entered this date. The Trustee's case as to proof of the deposits must therefore stand or fall on the basis of the existing record.

---

[7]   Exhibit 23 is purported to be a "Schedule of Deposits from 04/23/03 to 02/05/08." The Trustee had attached Exhibit 23 to his portion of the *Pretrial Statement,* but when the *Joint  Pretrial Statement* was filed, it was indicated that the Defendants had objections to Exhibit 23 on the basis of relevance and lack of foundation. Exhibit 23 was not admitted at trial. The mere fact that it was included in the *Pretrial Statement* as a potential exhibit does not make it evidence the Court may consider. *See, e.g., In re Mungo*, 2003 WL 043891 (N.D. Ill. 2003) (pretrial statement is not evidence but rather simply a statement of position by a party as to what the evidence might show).

Nothing in the pleadings or other pretrial filings establishes the amount of deposits.[8]
The Trustee's case at trial consisted of the testimony of the Debtor, submission of a deposition of
Kevin McKeegan (managing partner of MUS) that was admitted without objection in lieu of live
testimony, and a number of Exhibits that were admitted without objection.  Nowhere during the
questioning of the Debtor or McKeegan by the Trustee were they ever asked if the Debtor's
compensation  from MUS was deposited into the Entireties Account, nor did they volunteer such
testimony.  Based solely on this testimony, the Court would be unable to find that the Trustee had
met his burden of proof as to the fact and amount of the deposits.  The Trustee's Exhibits are not
much better in this regard.  None of them deal specifically with deposits into the Entireties Account,
and none were introduced by the Trustee for that purpose.  Furthermore, and in any event, merely
introducing a large volume of documents into evidence, without attempting to place them in a proper
context or to provide the Court with some guidance as to what they mean, is not acceptable.  *See,
e.g., Scurtu v. Hospitality & Catering Mgmt. Servs.*, 211 WL 521621 *5 (S.D. Ala. 2011) (rejecting
a "Here are our documents, Judge.  You figure it out" method of proving a case).

Given this rather surprising lack of testimonial or other evidence on such a key point,
and even though as indicated above it had no obligation to do so, the Court itself undertook a careful
review of the Exhibits and found one page of Exhibit 29 (list of unreimbursed travel and

---

[8]        Looking first at the pleadings, the Court sees no allegations in the *Amended Complaint* as to the
amount of the deposits, and in any event since the amount would arguably relate to the quantum of damages it is
questionable whether it could be the subject of a deemed admission.  *See*, *Fed.R.Bankr.P. 7008*, incorporating
*Fed.R.Civ.P. 8(b)(6)*.  As to the bare fact that there were such deposits, while there are  allegations to that effect in the
*Amended Complaint*, the Defendants have denied them.  *See, e.g.*, *Amended Complaint* and *Answer* at ¶14.  In his
portion of the *Pretrial Statement* the Trustee proposed a stipulation that between April 2003 and February 2008 payments
from MUS totaling $720,627.61 were deposited into the Entireties Checking Account.  *See* Adv. Doc. No. 98 at 8.
However, when the Defendants filed their portion of the *Pretrial Statement* they crossed that proposed stipulation out
and stated "**NOT STIPULATED BY DEFENDANTS.**"  *See* Adv. Doc. No. 100 (bold and all capitals in original).
When the *Joint Pretrial Statement* was filed, it did not include any stipulation as to the deposits.  *See* Adv. Doc. No. 101

entertainment expenses) and several pages in Exhibit 38 (list of expenses with unidentified payees) that on their face look like they may be parts of monthly statements for the Entireties Account and which include notations of "5,650.00 Direct Deposit-Payroll Meyer Unkovic Sc." These notations only total $56,500,[9] and in the absence of any explanation as to what they actually mean, the Court would be reluctant to accord them treatment as evidence sufficient to meet the Trustee's burden on the transfer issue. Thus, had Judge Markovitz not opted to defer ruling on the *Rule 52(c)* motions until the conclusion of trial, or had the Defendants chosen not to put on a case after he did indicate that he would so defer, it may have been found that the Trustee failed to meet his burden on this essential issue. *See Tr.Tran*. at 74 (Defense counsel arguing that "[t]he Plaintiff has not put in any evidence with respect to deposits into the entireties account").

Of course, neither of those things happened and so, as was indicated above, the Court must now consider the transfer issue on the basis of the entire record. When it does so, the Court finds evidence in the testimony of the Debtor, given during the Defendants' case, to the effect that it has been his consistent practice since his marriage in 1984 to deposit all his regular income into the Entireties Account. *See, e.g., Tr. Tran*. at 95 l. 2 through 96 l. 3; 102 ll. 1-7. The Court finds that this testimony is sufficient to prove that there was, in fact, a general practice whereby the Debtor's individual compensation from MUS was deposited into the Entireties Account. Thus, per *Meinen*, individual property of the Debtor was thereby converted into exempt entireties property,

---

[9]    The Court did this even though it has no duty to "scour the record" to find scattered references in the Trustee's Exhibits that support his case. *See, e.g.*, *Perkins v. City of Elizabeth*, 412 Fed. Appx. 554, 555 (3d Cir. 2011) (a court is not obliged to scour the record to find evidence that will support a party's claims). Nor does the Court contend that the notations it did identify are the only such ones in the Trustee's Exhibits. Having said that, the Court found references to these apparent $5,650 direct deposits for the dates of June 30, 2003 (Exhibit 29) and April 30, 2003; July 31, 2003; September 30, 2003; October 31, 2003; December 31, 2003; January 30, 2004; February 27, 2004; March 31, 2004 and June 30, 2004. It should also be noted that there are other entries for "Deposit reference No. Xxxxx" in various of the account statements, but no source is given for them.

constituting a transfer for *PaUFTA* purposes.  That conclusion, however,  still does not establish the amount of such deposits during the applicable period.  Proof as to that is yet more difficult to come by.

An initial question to be faced in considering the amount of deposits is what relevant period of time should be used.  In his portion of the  *Pretrial Statement,*  the Trustee submits that the  relevant period is April 2003 through February 2008.[10]  In their part of the *Pretrial Statement* the Defendants contest many points regarding the Trustee's positions, but this designation of the relevant period is not one of them.  In fact, the Defendants themselves propose April 23, 2003 as a starting date for the relevant period and state that they do not believe that to be in dispute.  *See Joint Pretrial Statement* at 29. The Court is therefore satisfied that the start date for  the relevant period of deposits in this case is April 23, 2003.  Determining the end date is a bit more difficult.

In  *Arbogast*, *Titus* and *Cohen* the bankruptcy court found that the appropriate "look back" period for an action under *PaUFTA* is four years.  *See,  Arbogast*, 466 B.R. at 300 (finding a look back period of the four years preceding the filing of the fraudulent transfer action in state court), *Titus*, 467 B.R. at 605-06 (same), *Cohen* 2012 WL 5360956 *9 (finding a look back period of the four years preceding the bankruptcy filing).  The difference in starting points appears to stem from the fact that in *Arbogast* and *Titus* the fraudulent transfer action had been started in state court before the bankruptcy filing, and then removed to this court, whereas in *Cohen* the action was

---

[10]      The rationale for this time period is not spelled out anywhere as far as the Court can tell.  It would appear that a starting point of April 2003 was arrived at by applying the 4-year statute of limitations/repose under *PaUFTA* to the April 2007 filing date for the Oberdick FTA.  *See 12 Pa.C.S.A. §5109.*  As to February 2008 as an end point, the genesis of that is less clear, though possibly it is tied in with the January 23, 2008 date on which the Debtor filed his bankruptcy case.

originated in the bankruptcy court. In that sense, the within action is the same as *Arbogast* and *Titus*, further reinforcing the appropriateness of an April 23, 2003 starting date.

In any event, in each of the three cases noted above the relevant period was determined to be four years. In the present case, by contrast, the Trustee is seeking a relevant period of approximately four years and ten months. Is there any authority to support that position, or should the relevant period be limited to only four years? As a first impression, the Court does not see why a continuing violation of *PaUFTA* that extends beyond the filing date of a fraudulent transfer action could not give rise to a relevant period extending for more than four years. This view also seems to be in accord with the District court appellate decision affirming *Arbogast*. The trustee in that case argued on appeal that she should have been able to recover for fraudulent transfers occurring all the way up to trial (a seven year period) because the state court complaint that had initiated the action alleged a continuing *PaUFTA* violation. The District court in that case rejected the trustee's argument and affirmed the use of only a four year period by Judge Markovitz. It did so, however, not based on some general principle that a continuing violation was impossible, but only on the ground that the trustee had voluntarily limited her claim to the four year period. *See*, *Arbogast*, 479 B.R. at 665.

In the present case, the pleadings also allege a continuing violation of *PaUFTA*. *See*, *e.g. Complaint* and *Amended Complaint* at ¶18 (describing transfers as continuing). Moreover, unlike in *Arbogast*, the Court has been pointed to nothing in the record to indicate that the Trustee ever limited his claim to a four year period, although he clearly has limited it to an end-point of "February 2008." The Trustee has not specified a specific date as an end point. The Court notes

26

that the filing date for the bankruptcy may have some independent significance that would impose

a cut-off under a continuing violation theory.[11]  The filing date here is also convenient in that it

rounds the relevant period off to exactly four years and nine months.  The Court therefore finds that

January 23, 2008, is the end date of the relevant period for the *PaUFTA* claims.

With the relevant period thus established, inquiry may turn to the amount of deposits

from MUS made into the Entireties Account during that period of time.  The Trustee has not made

it easy for the Court to make this determination.  As indicated earlier, no exhibit or testimony was

provided to establish the amount of such deposits.  The Court has considered a number of

approaches it might take to establish the amount of deposits:

- The Court could assume that Line 17 of the Defendants' joint
  tax returns (which were introduced as Exhibits) shows the
  income of the Debtor from MUS while he was a partner and
  identifies his wage income from MUS after he resigned as a
  partner, and then assume that it was all deposited into the
  Entireties Account.  Those returns show the following:

    2003 – $201,364
    2004 – $203,351
    2005 –  $287,870
    2006 – $218,673
    2007 – $228,889
    2008 –   no return submitted

  There would need to be a proration for 2003 because the
  relevant period does not start until April, so that year would
  be reduced to $151,023, and the total deposits would be
  $1,089,806.

---

[11]      For instance, in *Cohen*, Judge Deller found that the lookback period should be counted back from the
date of the bankruptcy filing.  2012 WL 5360956 *5.  *See also, 11 U.S.C. §541(a)(6)* (postpetition earnings of individual
debtor not property of the estate).

- Based on the Debtor's testimony as to regularity, the Court could assume a deposit was made each month by MUS during the entire relevant period. Based on the statement fragments found in the Exhibits, it appears that a regular monthly deposit of $5650 was made up through the end of 2004, and $6650 thereafter. The total proven deposits under this approach would be $364,700.

- The Court could find that in light of the Debtor's testimony, there is sufficient evidence to accept all the references to "Direct Deposit-Payroll Meyer Unkovic Sc" found in the Entireties Account statements in the Exhibits as proof of deposits, and set that amount, $128,300, as the proven deposits.[12]

- With no intent to be flippant, the Court might simply "throw up its hands" and find that even though the fact of deposits has been proven, there is insufficient evidence as to amount, which is tantamount to a failure to prove that any transfer occurred.

The Court finds itself in a considerable quandary here. It is tempting to simply find that given all the uncertainties, the Trustee has failed to prove that any amount was deposited. Although perhaps justified, such a result would ignore the Debtor's admission that there were regular deposits made from MUS. Thus, based on this admission, the Court somewhat reluctantly concludes that it must find a deposit amount based on the far-from-satisfactory evidence presented. Of the three possible approaches to that effect identified above, the Court can quickly rule out the initial one based on tax returns. As indicated, that leads to a result of $1,089,806, which is more than $300,000 in excess of what even the Trustee asked for in his proposed findings of fact. The

---

[12]     In addition to the $56,500 in such references found in the Trustee's Exhibits, *See* note 8, above, the Court found a further $ 71,800 in such references in the Defendants' Exhibits. *See* such references for November 28, 2003 and May 31, 2005 ($6650) in Exhibit N, and for April 30, 2004; May 28, 2004; July 30, 2004; August 31, 2004; October 29, 2004; November 30, 2004; December 30, 2004; January 31, 2005 ($6650); February 28, 2005 ($6650); and June 30, 2005 ($6650) in Exhibit M.

28

Court views the Trustee's proposed finding as establishing an upper bound on the amount of deposits, and it will not adopt an approach that would result in a number that exceeds that boundary.

The Court must therefore choose from one of the two remaining options and after giving the matter some thought concludes that the option of assuming a regular monthly deposit of $5,650/$6,650 during the relevant period of time, even though there is not confirming documentary evidence as to all of those months, best harmonizes the Debtor's testimony with the available evidence.  Thus, the Court concludes that the Trustee has met his burden of proof by a preponderance of the evidence on the transfer issue under *PaUFTA* to the extent of $364,700 in deposits of Debtor's compensation from MUS into the Entireties Account having been made during the relevant period of time.[13]

### A. (5)(c)    *How Must the Amount of Transfer be Adjusted?*

Both sides are in agreement that, even though a transfer is proven,  the gross amount of deposits into the Entireties Account during the relevant period does not *ipso facto* establish the amount of liability for a "fraudulent" transfer under *PaUFTA* because, under the rubric of "reasonably equivalent value," certain other factors may come into play to effectively reduce that amount. *See also*, *12 Pa. C.S. A. §5108(c)* (money judgments entered under *PaUFTA* based on the value of the asset transferred must be for an amount equal to the value of the asset at the time of transfer, "subject to adjustment as the equities may require.")  For instance, expenditures of a

---

[13]       As will become evident in the discussion that follows, the Court's denial of the Trustee's Motion seeking leave to amend the trial record has no affect on the outcome of the case.  Even if the Court had granted that Motion, the Trustee would not have made a recovery in the Oberdick FTA.

particular type made from the Entireties Account, or deposits into the Entireties Account from other sources, may in essence  act as setoffs to lower the amount of the transfer that can be characterized as a fraudulent transfer.  The Parties disagree on how the reasonably equivalent value principle should be implemented,  so the Court must first determine what rules to apply, and then apply  them in view of the evidence that has been presented.

An initial issue to resolve pertains to the status of certain decisions that were made while fraudulent transfer actions in some of the other Titus cases were still in the state court ("the State Court Decisions").[14]  Those decisions are favorable to the Defendants in that they held that (a) the direct deposits of a debtor's individual compensation into an entireties account only constitutes a fraudulent transfers to the extent that they are spent on "luxuries," and (b) even to the extent that such deposits are spent on luxuries, thereby making them fraudulent transfers, they can only be recovered from the debtor's spouse if  she is the one who actually spent such deposits, and the luxury purchases actually benefitted her.  The Defendants seek to characterize these State Court Decisions as the law of the case, such that this Court is bound to follow that approach as well.  The Trustee, on the other hand, contends that the Court is not required to follow them, and that instead it should follow *Meinen* and only allow  expenditures for "necessities" to be excluded from treatment as a possible fraudulent transfer on the basis that such expenditures can be viewed as the receipt of reasonably equivalent value in that the funds are used to satisfy an antecedent debt.

---

[14]     The State Court Decisions were rendered by the Hon. R. Stanton Wettick of the Allegheny County Court of Common Pleas on May 29, 2008 and April 2, 2009.  The Debtor had already filed his bankruptcy petition (January 23, 2008) and removed the Oberdick FTA to this Court (April 22, 2008) before the first State Court Decision was issued.

Judge Markovitz dealt with this same issue in some detail in the *Arbogast* and *Titus* cases. *See*, *Arbogast*, 466 B.R. at 304-06; *Titus,* 467 B.R. at 609-510.  For a variety of reasons, he concluded that the State Court Decisions were not binding in those cases.  His entire chain of reasoning need not be repeated here, but basically he found that the state court decisions were not entitled to preclusive effect under *res judicata*, collateral estoppel, or the *Rooker-Feldman* doctrine, and that even if they could be accorded such treatment in a non-bankruptcy setting, such would not apply here because the Trustee was not a party to the state court case or in privity with a party to that case.  Judge Markovitz further found that the law of the case doctrine did not apply with respect to the State Court Decisions, or if it did, then the exception to that doctrine for the correction of a glaring error of law applied.  Finally, he found that any preliminary rulings or indications given by Judge McCullough during the time he had the Titus cases to the effect that he would follow the State Court Decisions were merely interlocutory and either were not binding on him or were subject to the glaring error of law exception to the law of the case doctrine.

Judge Markovitz's decision on this point was affirmed on appeal, *See* 479 B.R. at 667.  Judge Deller reached a similar conclusion in *Cohen*, 2012 WL 5360956 *7, also affirmed on appeal, 2013 WL 772705 *11-13 (citing reasons for disagreement with Judge Wettick's ruling).  This Court also finds that it is not obliged to follow the holdings of the State Court Decisions with respect to how the reasonably equivalent value principle should be implemented and it  must, therefore, proceed to decide what law will be applied.

In *Arbogast* Judge Markovitz concluded that *Meinen* more accurately sets forth  the state of Pennsylvania law on these points.  The State Court  Decisions offered no real analysis or

31

authority to support the conclusions reached, whereas *Meinen* did cite some Pennsylvania cases to

support its conclusion. *See*, 232 B.R. at 842-43. There has also been additional case law since

*Meinen* was decided, bolstering its main conclusions, namely *Arbogast, Titus* and *Cohen,* themselves

(both bankruptcy and appellate decisions). The Court therefore finds itself in agreement with

*Meinen*, and in particular fully endorses the following portion of the holding *in Arbogast* as equally

applicable here:

> Consistent with Meinen, the Court holds that the direct deposits of the
> Debtor's individual compensation into the Entireties Checking Account may
> constitute fraudulent transfers, at least constructive fraudulent transfers,
> unless they were spent on necessities. Therefore, it is irrelevant to the issue
> of whether such deposits constitute constructive fraudulent transfers that
> they were not spent on luxuries; that is, even if such deposits were not spent
> on luxuries, they may still constitute constructive fraudulent transfers if they
> were not spent on necessities. Consistent with Meinen, such direct deposits
> may also constitute constructive fraudulent transfers if they were used by
> the Debtor and Mrs. Arbogast to purchase other assets which are presently
> held as entireties property by them, regardless of their necessity to the
> Debtor and Mrs. Arbogast.
>
> The Court also holds that Mrs. Arbogast was an initial transferee along with
> the Debtor of all of the direct deposits of the Debtor's individual
> compensation into the Entireties Checking Account from the moment that
> such deposits occurred, regardless of whether (a) she is the one who later
> spent such deposits, and (b) that which was purchased with such deposits
> actually benefitted her. Therefore, to the extent that such deposits are
> determined to constitute fraudulent transfers, the Trustee, pursuant to
> *§550(a)(1)*, may recover the value of such transfers from either the Debtor
> or Mrs. Arbogast. What that means is that, by virtue of the Trustee's
> entitlement under § 550(a)(1) to so recover such value, she may obtain a
> joint and several money judgment against both the Debtor and Mrs.
> Arbogast in the amount of such value.

*Arbogast*, 466 B.R. at 306-07.

Another issue is presented by the fact that other deposits, aside from the direct-

deposit of Debtor's MUS compensation, were made into the Entireties Account during the relevant

period of time.  The Defendants state that they demonstrated at trial, without dispute, that deposits

of $129,554.08 were made into the Entireties Account from such sources as Sally Oberdick's

earnings and gifts from family members.  Def. Ex. N, *Trial Tran.* at 132-38, 145-53, 180, 183.  The

Court agrees that this was sufficiently demonstrated by the Defendants and not rebutted by the

Trustee.  The Defendants also argue that the Trustee has made an 'admission" that additional

deposits of in excess of $430,000 were made into the Entireties Account during the relevant period,

citing to the Trustee's Proposed Finding of Fact No. 12, Doc. No. 125.  However, this proposed

finding of fact is not accompanied by any citation to the record (a problem that applies to all of the

Trustee's proposed findings, as distinguished from those of the Defendants which are carefully

supported by record citations).  Moreover, the proposed finding does not state any source for these

"additional deposits," and in the absence of any such tie-in the Court will not simply assume they

are intended to refer to non-MUS compensation deposits and treat it as a binding admission by the

Trustee.  Thus, the Court finds that during the relevant period $129,554.08 in deposits were made

into the Entireties Account from sources other than the Debtor's MUS compensation.

        The question then turns to what must be done with these other deposits.  The

Defendants claim that these other deposits provide "dollar-for-dollar" consideration for

corresponding deposits by the Debtor, resulting in total deposits of $259,108.16 into the Entireties

Account that were available for use by the Defendants for any purpose.  The Defendants appear to

base that argument on the decision by Judge Markovitz in *Titus*.  In particular, using rounded

numbers, in that case Judge Markovitz found that the trustee had proven that the debtor had made

individual wage deposits of $575,000 into the Entireties Account, and that "objectional" (i.e., non-

necessary") expenditures of $423,000 had been made.  However, it had also been established that

33

$143,000 of social security income was also deposited into the account. Judge Markovitz found that it was at least as likely as not that funds from the social security deposits were used to pay the objectionable expenses. He therefore concluded that the trustee had failed to prove that $143,000 of the objectionable expenses had been paid by transfers of the debtor's compensation into the account, resulting in a reduction in the recovery the trustee could make by that amount.[15]

With all of the various preliminary matters resolved, the Court can now turn to an analysis of the expenditures from the Entireties Account.

### A. (5)(d)   *Expenditures From the Entireties Account*

The Trustee has identified four categories related to the Entireties Account for which he seeks recovery. These are, expenditures for education, expenditures for travel, checks drawn to cash, and checks not produced. Each of these categories is discussed in turn.

---

[15]    The Court does have some concerns about the approach adopted by Judge Markovitz in *Titus* as to this point. It would result in an effective reduction by $129,554.08 of any liability ultimately imposed on the Defendants under the *PaUFTA* claims. It would seem to put nearly an impossible burden on the Trustee to show that a particular expenditure was "funded" by a specific deposit, given that funds from different sources were commingled in a single account. There is also a fairness issue in the *Titus* approach in that it was the defendants who created the uncertainty by commingling the funds, yet it is the Trustee who is expected to somehow unravel it. There are other possible ways to handle this "other deposit" issue that would avoid the problems noted above. For instance, the burden of proof could be placed on the Defendants to show that funds from the other deposits were used for non-necessary expenditures from the Entireties Account. Or a presumption could be employed whereby a pro rata share of the non-necessary expenditures could be deemed to have come from funds originating from the other deposits. In the present case, for example, since the Court has found Debtor MUS' deposits of $364,700 and other deposits of $129,554.08, that would mean roughly 26% of the non-necessary expenditures would be attributed to the other deposits. That would have the effect of reducing the offset to approximately $33,000. Were the Court writing on a blank slate here and free to do so, it would give serious consideration to taking an alternative approach to treating other deposits. However, the method adopted by Judge Markovitz was also employed in *Cohen* and was affirmed on appeal. *See* 2013 WL 772705 *4. Therefore, the Court is required to use that same method here and will do so.

### A. (5)(d)(i)    Education Expenses

In this category, the Trustee is challenging $82,536.22 worth of expenditures from the Entireties Account during the relevant period that were used to pay for the college education of two of the Defendants' children.  *See* Exhibit 28.[16]  The expenses in question relate to the attendance of one of the children at the University of Chicago, and the other at Robert Morris University, both as undergraduate students.  The Trustee points to Pennsylvania law providing that parents have no legal obligation to provide for the education of their children beyond the age of 18, or graduation from high school, whichever occurs later.  *See, Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992).  The Trustee argues that *Blue* has established that "enhanced" education is not a necessity, and that therefore the expenditures in question from the Entireties Account were for non-necessities, which the Trustee may recover.

The Defendants argue that the expenses in question should be considered as having been made for necessaries for purposes of the claims under *PaUFTA*.  They point out that they testified without contradiction at trial that they viewed college tuition and related educational expenses for the children as a family obligation.  *Tr. Tran.* at 108-09, 173-74, 180.  They also point to unrebutted testimony to the effect that, except for small unsubsidized student loans, they were denied student aid for college for the two children by both the state and federal governments because of their "expected family contribution."  *Tr. Tran.* at 104-08.

---

[16]    At trial the Defendants questioned the amount of one of the checks drawn on the Entireties Account that was listed in Exhibit 28, and the inclusion of two other such checks.  The Trustee in his post-trial brief indicated that he accepts the Defendants' view as to these, resulting in the $82,536.22 figure rather than the figure of $89,657.14 as set forth in the Exhibit.  *See* Doc. No. 114 at 4-5.

35

Judge Deller dealt with this very issue in the *Cohen* case. Although acknowledging

that *Blue* remains good law, and noting that the Pennsylvania legislature has never acted to try to

undo its holding as regards married parents living together,[17] he nevertheless cogently stated:

> While the Pennsylvania legislature has not yet enacted a statute that requires
> parents to pay for their children's post-secondary [undergraduate]
> education, this Court holds that such expenses are reasonable and necessary
> for the maintenance of the Debtor's family for purposes of the fraudulent
> transfer statute only.

2012 WL 5360956 at *10. This Court agrees with that conclusion. What is a "necessity" for

purposes of family obligation law is not necessarily congruent with what should be considered a

necessity for purposes of an action under *PaUFTA*. Even though there may not strictly speaking be

a legal obligation for parents to assist in financing their children's undergraduate college education,

in following Judge Deller's lead in the *Cohen* case, this Court has little hesitation in recognizing that

there is something of a societal expectation that parents will assist with such expense if they are able

to do so. If there were some evidence that the Defendants had made the educational expenditures

in question as part of a strategy or with an ulterior motive to shield the funds from the reach of

Trizec, the Court might view this differently. The evidence, however, points to the contrary, *i.e.*,

that the expenditures were made out of a reasonable sense of parental obligation. Thus, the Court

concludes that payments out of the Entireties Account used toward the undergraduate college

education of the Defendants' children were for necessities for purposes of the *PaUFTA* claims.

---

[17]    Judge Deller did recognize that following *Blue* the legislature passed a statute requiring separated, divorced, or unmarried parents to provide post-secondary educational support to adult children, but that statute was challenged and the Pennsylvania Supreme Court invalidated it on equal protection grounds. *See*, *Curtis v. Kline*, 542 Pa. 249, 666 A.2d 265 (1995).

That is not the end of this matter, however, because not all of the expenses as shown in Exhibit 28 fit within that description.  By the Defendants' own admission, the following listed expenses do not so fit:

- A $1,000 gift to a friend of Defendants' son to help with his college tuition.
- A $322.92 payment for supplies relating to Mrs. Oberdick's work.
- Payments totaling $4,741.15 for high school trips taken by the Defendants' children to Italy.
- Payments totaling $155 to the University of Pittsburgh as alumni contributions.

In addition to the above, the Court itself has reviewed Exhibit 28 and finds that an expenditure of $560 on February 16, 2007, for "Delta Upsilan Fraternity" is not  a necessary and reasonable educational expense and the Trustee has met his burden in this regard. These expenditures, a total of $6,779.07, cannot be considered necessities within the Court's holding, therefore they are subject to recovery by the Trustee as constructive fraudulent transfers.

### A. (5)(d)(ii)    Entertainment/Travel Expenses

With respect to this category the Trustee submitted Exhibit 29 at trial, seeking $9,441.88 for entertainment and travel expenses.  However, in his post-trial brief the Trustee states that the Exhibit was "fundamentally revised" by the testimony at trial, and as a result he is now seeking only $7,000.82 in this category.  More specifically, the Trustee says that airline charges of $25 and $169.40 on Lines 13 and 17 of the Exhibit should be deleted because of the Debtor's testimony that these were work-related expenses for which he was ultimately reimbursed.  The

Trustee also states that a hotel charge of $4,746.66 for a high school trip to Italy should be removed from the list because of the Debtor's testimony that he was subsequently reimbursed for this expenditure after he returned from the trip. Partially offsetting this amount, however, the Debtor contends that $2500 should be added back because of the Debtor's testimony that the Defendants paid $2500 to their son's school for this same trip. The Court will certainly honor the Trustee's requests as to the deductions, but the proposed $2500 add back is another matter. There was no testimony that this amount was paid from the Entireties Account, so the Court cannot find that the Trustee has met his burden of proof as to that item.

The remaining items in Exhibit 29 are potentially recoverable. Items 1-5 and 7-9 are related to expenses incurred on the trip to Italy, which can in no way be considered a reasonable education expense. Item 10 on the list was related to a personal family vacation trip. Items 11-12, 14-16, and 18-19 all relate to payments for the Defendants' son to travel back and forth to his college in Chicago. Despite having ruled above that undergraduate college education expense is a necessity for *PaUFTA* purposes, the Court does not view these travel expenses as necessities. The Defendants' son could have as easily attended a school closer to home, making these travel expenses avoidable.

To sum up, the Court finds that the Trustee has adequately proven by a preponderance of the evidence that $4,500.82 is recoverable in the entertainment/travel category.

### A. (5)(d)(iii)    Checks Not Produced

Under this category of expenditures from the Entireties Account, the Trustee is

38

seeking to recover $101,352.88. This category is comprised of 36 checks drawn on the Entireties

Account between April 28, 2003 and March 19, 2004, for which the payee is unknown. *See* Exhibit

38.[18] The checks in question are documented by check number on statements for the Entireties

Account, but the payees on the checks are unidentifiable with any certainty because no one produced

copies of the checks themselves. The Debtor testified at trial that it is not his practice to retain

checks from year to year, and that by the time PNC Bank was subpoenaed in 2011 to produce checks

drawn on the Entireties Account it only had checks going back to sometime in March 2004, the ones

from before then having presumably been destroyed pursuant to the Bank's retention policy. *See*,

*Tr. Tran* at 38, l. 1 through 39, l. 19; 122, l. 3-14.

   Based on a review of the Trial Transcript by the Court, the following picture emerges

of the litigation activities related to the checks in question. In 2006 or 2007 the Debtor was deposed

in connection with one of the state court proceedings, either the Lease Litigation or the Oberdick

FTA. The notice of deposition directed him to produce bank records at that deposition, almost

certainly going back at least to 2003. The Debtor objected to the production request on the basis of

"burden and scope," and only produced records going back one year prior to the deposition. Trizec

never filed a motion to compel or took other action at the time seeking to require the production of

earlier records. After the Debtor filed his bankruptcy petition (on January 23, 2008) and the

meeting of creditors was held, the Trustee sent a letter to Debtor's Counsel dated May 1, 2008,

seeking banking records related to the Entireties Account going back two years prior to the

bankruptcy filing. The requested documents were provided to the Trustee on May 22, 2008.

---

[18]  Exhibit 38 as submitted at trial included two other checks that totaled $6000, but the payees on those two were identified at trial and the Trustee voluntarily withdrew his claim with respect to them.

Nothing further was requested by the Trustee until a few months prior to the trial, at which time the Trustee asked the Defendants for, *inter alia*, records related to the Entireties Account going back to 2003.  It was at that point the Defendants subpoenaed the records from the Bank.

The Parties disagree on who is to blame for the failure to produce the checks.  The Trustee argues that the Defendants knew or should have known by no later than the filing of the Oberdick FTA on April 23, 2007, that all of the deposits into and withdrawals from the Entireties Account from as early as 2000 were the "primary subject" of the litigation.  The Trustee points out that if the Defendants had requested the records from the Bank at any time prior to 2010 the checks in question would have been available.  The Defendants, on the other hand, argue that the Trustee did not request copies of the checks until discovery was almost over, only shortly before the trial was to start.  They also argue that the Trustee had the ability to subpoena the records himself from the Bank at any time but he never did so.

As an initial matter, the Court itself is somewhat surprised that the Trustee took no action to seek copies of the checks until the "eleventh hour."  It would  seem to be a reasonably prudent thing for a plaintiff, early in the case in preparation for trial, to take such action regardless of the ultimate outcome on the issue of who would bear the burden of proof.  That having been said, however, it is nonetheless the case that this Court has adopted the burden of proof structure as set forth in *Arbogast*, and under that structure even though the burden of proof rests with the Trustee, it is the Defendants who had an initial burden of production.  Therefore, to the extent that "blame" must be meted out for the failure to produce copies of the checks, the Court has no choice but to place that blame on the Defendants.

40

Assigning such blame, however, does not necessarily mean that the Trustee therefore automatically prevails with respect to all of the checks in this category.  Actual copies of the checks would clearly have been the preferred evidence to show the identity of the payees, but that may not have been the only way of doing so.  Going back to *Arbogast* itself, the Court finds the following comment by Judge Markovitz instructive:

> ... the Court can and will impose on constructive fraudulent transfer defendants, herein the Debtor and Mrs. Arbogast, the burden of producing at least some useful evidence regarding what the funds deposited into an entireties bank account are ultimately spent on; the precision regarding such evidence will necessarily vary depending upon the circumstances.

466 B.R. at 308.

The Court has reviewed the Trial Transcript and the various exhibits submitted by the Parties,  keeping in mind that there is some flexibility in the "precision" of the useful evidence which the Defendants were required to produce to show what the 36 checks were spent on.  Based on that standard, the Court agrees with the Defendants that they have provided sufficient evidence with respect to at least some of the checks to meet their burden of production.  Testimony by the Defendants, as confirmed by the payment history for subsequent periods of time for which documentary records are available, convinces the Court that it is very likely that checks for a payment amount rounded off to a $500 figure were made for mortgage payments, home equity payments, or credit card payments.  *See, e.g. Tr. Tran* at 125, l. 21 - 127, l. 10; 157, l. 15-23; Exhibit M.[19]

---

[19]    Compare, for example, the testimony by the Debtor in the present case where he was able to state a likely purpose for some of the "missing" checks,  with the testimony of the debtor in *Cohen* who could provide no answer as to the purpose of unexplained payments.  2012 WL 5360956 at * 13.

The Court thus finds that the Defendants have met their burden of production with respect to those particular checks.  Furthermore, since the Trustee is not seeking a recovery for payments from the Entireties Account for mortgage, equity loan or credit card debt, those checks must be deducted from the amount sought by the Trustee in this category.  After making the necessary adjustments, the Court therefore finds that the Trustee has met his burden and may recover $26,678.24 under this category.

### A. (5)(d)(iv)    *Checks to Cash*

In this category, the Trustee is seeking a recovery of $28,500 based on seven checks that were issued by the Defendants during the relevant period. *See* Exhibit 38A. Each of the checks was made payable to "cash" and drawn on a Thrivent Investment Management, Inc. account owned jointly by the Defendants.  There is no allegation that any of the MUS deposits were made into the Thrivent account, and the evidence indicated that the proceeds of these checks drawn on the Thrivent account were deposited *into* the Entireties Account. These deposits, in fact, constitute a portion of the $129,554.08 of deposits into the Entireties Account from sources other than the Debtor's MUS compensation, as previously found by the Court.

The Defendants argue that the transactions represented by these deposits of funds into the Entireties Account do not fall within the scope of the *PaUFTA* claims, which focus solely on deposits of the Debtor's MUS compensation  into the Entireties Account.  The Court agrees with the Defendants.  It is not disputed that the Thrivent Account was a joint asset of the Defendants, and transfers from that account into the Entireties Account can in no sense be viewed as fraudulent

42

transfers as to individual creditors of the Debtor. The Trustee claims that the Defendants failed to meet their burden of proving that the "checks to cash" were used for necessary expenses, but the Defendants had no such burden. The Court finds that it is the Trustee who has failed to meet his burden as to this category, and who has failed to provide a convincing rationale as to why deposits from one joint account to another joint account can even be considered fraudulent transfers.

### A. (5)(d)(v)    Summary of Findings on Oberdick FTA

To sum up, the Court finds that the Trustee has met his burden of proving that the following amounts in each of the four challenged categories were not spent on necessities by the Defendants, and are therefore recoverable:

| | | |
|---|---|---:|
| Education | $ | 6,779.07 |
| Travel/Entertainment | $ | 4,500.82 |
| Checks not produced | $ | 26,678.24 |
| Checks to cash | $ | 0.00 |
| Total | $ | 37,958.13 |

For reasons that are explained above, against this amount the Defendants are entitled to an "offset" of $129,554.08 to represent the deposits from "other" sources that were made into the Entireties Account during the relevant period. It can be seen that this offset reduces the recovery to zero, so the Trustee may recover nothing on his *PaUFTA* claims.

### B.    Objections to Exemptions

In the *Objections to Exemptions*, Trizec challenges two assets that the Debtor has

43

claimed as exempt.  These are retirement fund contributions in the amount of $ 38,446.00 that were

made by MUS into the Debtor's retirement fund, and MUS "wages" in the amount of $ 70,707.00

which were being held in a partnership account by MUS on behalf of the Debtor at the time of his

bankruptcy filing.  As was noted previously, the Trustee never joined in these *Objections* or moved

to be substituted for Trizec, and it is far too late for him to do so now.[20]

Before these two objections can be considered, a preliminary matter that has been

raised by the Debtor must be addressed.  In a May 25, 2010 Order, the Court directed that on or

before 90 days prior to trial the Plaintiffs were to serve a pre-trial statement that disclosed "all

property claimed as exempt as to which plaintiffs continue to contest an exemption."  *See* Adv. Doc.

No. 66.  The Debtor argues that the pre-trial statement says nothing about Trizec continuing to

contest the objections regarding the retirement account and the partnership account, and that

therefore the *Objections* have been waived.  *See, e.g.*, *Tr. Tran.* at 71, l. 19 through 73, l. 3.

The Court agrees with the Debtor that, in light of the May 25, 2010 Order,  the pre-

trial statement could and should have been clearer on which of the *Objections* that Trizec intended

to pursue at trial.  The only explicit reference in the pre-trial as to objections to exemptions was with

respect to the exemption claimed by the debtor in Schedule C based on entireties ownership, i.e., the

exemption claimed for the Entireties Account.  However, Trizec points out that there were at least

some oblique references in the pre-trial statement which can be broadly read as an intention to

---

[20]    In his post-trial brief, the Trustee states that *he* is challenging the retirement fund contributions and
the "wages" being held by MUS.  However, neither of these groups of transfers is covered within the scope of the
*Amended Complaint*.  The Court thus views the only proper basis for pursuing these items as being pursuant to the
*Objections*, to which the Trustee is not a party.  The Court will ignore these misstatements in the post-trial brief and treat
the arguments as being made by Trizec.

44

pursue the other *Objections*.  For instance, the pretrial statement listed Exhibit 18, "partner capital summary" for MUS, and identified Kevin McKeegan as a witness.  There is no apparent reason for this exhibit and that witness except with respect to the *Objections* concerning the retirement fund contribution and the partnership account, so at least implicitly Trizec was indicating they were still being pursued.

Although the May 25, 2010 Order was not complied with as carefully as it should have been, the request by Debtor to find a resulting waiver is asking for a severe sanction which the Court believes would only be appropriate if the Debtor could show he would be unfairly prejudiced if a waiver were not found.  Having reviewed the trial record, the Court does not find that the Debtor was unfairly surprised or prejudiced by Trizec's continued pursuit of objections to the exemptions claimed in the retirement fund contributions or the funds in the partnership account.  The Court therefore finds that those *Objections* were not waived by the failure to explicitly set them forth in the pre-trial statement.  The Court now moves to a substantive consideration of the *Objections*.

### B. (1)    *Contributions to Retirement Fund*

In Schedule C of his petition, the Debtor claimed an exemption of $165,133.32 in the 401(k) profit sharing plan of MUS on the basis of *42 Pa. C.S. §8124(b)(1)(vii)*. Trizec objects to the exemption of contributions that were made by MUS into that plan for the benefit of Debtor on the last day of the years 2003 ($20,000),  2004 ($20,500), 2005 ($26,000), and 2007 ($13,500).  With respect to the first three of these contributions, Trizec objects only to the portion of the contribution that exceeded the 6% mandatory level imposed by MUS.  Trizec contends that amounts in excess

45

of the mandatory contribution were "voluntary," in the nature of fraudulent transfers, and thus can

be recaptured for the bankruptcy estate.    The amounts objected to for each of these three

contributions, respectively, are $7,919, $8,299, and $8,728.    As for the 2007 contribution of

$13,500, Trizec objects to the full amount of the contribution as having been made within one year

of the bankruptcy filing, which Trizec contends removes this contribution from any exemption

protection, pursuant to *42 Pa. C.S. §8124(b)(1)(ix)(A)*.  The total amount objected to is thus $38,446.

*See* Exhibit 32.    Trizec argues that the challenged contributions are similar to the deposit of the

Debtor's individual earnings into the Entireties Account in that it has the effect of shielding the

funds so deposited from creditors.    It further argues that the Debtor knew he was at least potentially

obligated to Trizec when the transfers were made.

The Debtor's first argument in opposition to this objection is that the MUS 401(k)

plan is excluded from the his estate pursuant to *11 U.S.C. §541(c),*[21] which provides:

> (c)(1) Except as provided in paragraph (2) of this subsection, an interest of
> the debtor in property becomes property of the estate under subsection
> (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an
> agreement, transfer instrument, or applicable nonbankruptcy law–
>
>> (A) that restricts or conditions transfer of such interest by the
>> debtor; or
>>
>> (B) that is conditioned on the insolvency or financial condition of
>> the debtor, on the commencement of a case under this title, or on
>> the appointment of or taking possession by a trustee in a case under
>> this title or a custodian before such commencement, and that effects
>> or gives an option to effect a forfeiture, modification, or
>> termination of the debtor's interest in property.

---

[21]    As originally filed on January 23, 2008, the Debtor's petition, in Schedule B, showed the MUS 401(k)
plan as an asset of the estate, and then in Schedule C claimed an exemption of the plan pursuant to *42 Pa. C.S.
§8124(b)(1)(vii)*.  On February 13, 2008 the Debtor filed Amended Schedules B and C.  The Amended Schedule B lists
the MUS plan for "informational purposes only", saying that it is excluded by *Section 541(c)(2)*.  The Amended Schedule
C claims an exemption for the MUS plan to the extent it is found to be property of the estate and changes the statutory
basis for the exemption to *42 Pa. C.S. §8124(b)(1)(ix)*.

> (2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

There is no dispute that the MUS plan is an *ERISA*-qualified plan,[22] *Keegan deposition* at 76 l.14, and that it includes an anti-alienation provision. *See* Exhibit L at Section 7.11. It has been well-recognized since *Patterson v. Shumate*, 504 U.S. 753 (1992), that "applicable nonbankruptcy law" for purposes of *Section 541(c)(2)* includes *ERISA*. Additionally, to the extent that it may be relevant whether the MUS 401(k) plan constitutes a "trust" for purposes of *Section 541(c)(2)*, the Court notes that the plan document provides for the assets of the plan to be placed in a "Trust Fund" under the control of an appointed "Trustee." *See* Exhibit L at Article 7. This case is thus distinguishable from those in which it has been held that a 401(k) plan was not excluded from property of the estate pursuant to *Section 541(c)(2)* because the funds of the plan were not being held in a trust. *See, e.g., In re Seaton*, 346 B.R. 389 (Bankr. W.D. Pa. 2006) (plan which provided for assets to be held in a group annuity contract was not held in trust within meaning of *Section 541(c)(2)*).

The Court thus starts out with a very strong presumption that the MUS plan in this case is <u>not</u> property of the estate. The only authority that Trizec cites in support of its position regarding this objection is *Matter of Loomer*, 222 B.R. 618 (Bankr. D. Neb. 1998) where the court found that a Chapter 7 trustee could recover voluntary contributions that a debtor had made to an *ERISA*-qualified retirement plan after the date he was declared to be in breach of a franchise agreement. Trizec seeks to liken the situation in *Loomer* with that here, arguing that the "voluntary"

---

[22]    *ERISA* is the Employee Retirement Income Security Act of 1974.

portions of the contributions made into the MUS plan were all made after the Debtor knew or should have known that he might be liable to Trizec for the breached lease.

The Court has reviewed *Loomer* and finds it to be unpersuasive and inapplicable here for a couple of reasons.  First, for whatever reason, the question of whether the funds in the retirement plan were property of the estate under *Section 541(c)(2)* was not even discussed in *Loomer*.  The case thus does not touch upon the main issue which the Court is presented with here.  Second, although the *Loomer* court did allow the trustee to recover the voluntary contributions that had been made by the debtor there, it was careful to note that it was doing so only because it had found that the transfers in question were made with the actual intent to hinder, delay or defraud creditors.   *See*, 222  B.R. at 622.  In sharp contrast, this Court has already determined  that the Debtor did <u>not</u> act with any actual fraudulent intent.  Thus, even if the Court were to follow the approach taken in *Loomer* as an exception to a *Section 541(c)(2)* exclusion, it would still find that no actual fraudulent intent has been shown, and that therefore, the MUS plan funds are not part of the Debtor's estate.

Having concluded that the MUS plan is not property of the estate, the Court need not consider the alternate "defense" to this objection raised by the Debtor, *i.e.,* that the plan can be exempted under *42 Pa. C.S.  §8124(b)(1)(ix).*

### B. (2)   *"Wages" Being Held by MUS*

After obtaining a judgment in the Lease Litigation, Trizec sought to garnish the Debtor's partnership account at MUS by serving a writ of garnishment in 2006.  The account has

apparently remained frozen since that time and the amount in that account is what is at issue in this

objection.   When the Debtor filed his petition,  he listed an asset of $71,000[23] on Schedule B

described as "Wages owed from Meyer, Unkovic & Scott, LLP for 2006." He claimed an exemption

for this same amount on Schedule C pursuant to *42 Pa. C.S. §8127*, a Pennsylvania statutory

exemption provision entitled "Personal earnings exempt from process," which provides in pertinent

part:

> The wages, salaries and commissions of individuals shall while in the hands
> of the employer be exempt from any attachment, execution or other
> process...

*42 Pa.C.S. §8127(a).*

Trizec's theory is that the amount in the partnership account represents the Debtor's

share, as a partner in MUS, of the "capital" or "profits" of the partnership, not the wages of an

employee.  *See* Exhibit 18 (partner capital summary for Debtor in MUS).   Trizec also points to a

decision by Judge Friedman of the Allegheny County Court of Common Pleas rendered shortly

before the bankruptcy was filed which it says found that the funds in the account represented

partnership profits that were not protected by *Section 8127(a).  See* December 3, 2007 *Memorandum*

*in Support of Order* in *Trizechahn Gateway LLC v. Titus*, GD 00-13044 (Allegheny County Court

of Common Pleas) (hereinafter, "the *Friedman Memorandum*").

The Debtor, on the other hand, argues that even though he was an equity partner in

MUS, he was in reality a "working partner" whose  compensation was performance-based.  The

Debtor cites several cases in which courts have treated similar law firm partnership accounts as

---

[23]      The Trizec post-trial brief shows the amount at issue in the account to be $70,707.  Other than being
a function of "rounding," the Court is unsure of the reason for the minor discrepancy in amounts between the petition
and what Trizec claims is owed in the post-trial brief.  Since the funds in question are being held in an account, the
amount may have fluctuated over time due to interest or market changes.  The Court views the dispute to involve the
present value in the account, regardless of what that exact amount may be.

wages rather than profits.  The Defendants introduced Exhibit O during their case, without objection, and the Debtor testified that it shows the funds in the partnership account are comprised of four components.

Based on Exhibit O, the first component is $6500 that the Debtor was scheduled to have received as a "draw" for the month of September 2006.  When the writ of garnishment was served the account was frozen and this draw was never paid.  The second component is $12,300 that was to have been paid to the Debtor in September 2006 as a "quarterly tax draw."  Again, this was not paid because the account was frozen.  The third component is $36,505 designated as "undistributed earnings."  Finally, $16,395 is designated as "required capital pay-in."

The Debtor credibly testified that his income from MUS as a partner was largely, though not entirely, dependent on his own efforts (both billable and non-billable hours).  Fees that MUS collected from its clients for billable hours put in by the Debtor exceeded the total compensation that he was paid by $100,000 or more in the years from 2000-2005.  Based on these facts, the Debtor asks that the Court recognize a distinction between a partnership based on the personal efforts of the partners, such as MUS,  and a partnership based on passive investment.  He argues that payments he received from MUS while a partner were "in the nature of compensation for personal services and, as such, [constitute] wages and salary that is subject to the exemption" set forth in *Section 8127* despite the Debtor's title as a  "partner" in MUS. He further argues that the periodic draws that he received from MUS played substantially the same role in his economic life as an employee's wages.  *See, generally*,  Defendants' Proposed Findings of Fact and Conclusions of Law at 55, *et. seq.*

50

Nevertheless, it is also clear that there are significant differences between the compensation that the Debtor received by virtue of his status as a partner of MUS and the compensation received by an employee in the form of wages. The profits of MUS, after payment of employee salaries and other business expenses, were distributed to its equity partners pursuant to a formula agreed to by the partners in a partnership agreement. A portion of the profits were distributed on a discretionary basis by the Compensation Committee of the firm depending on a number of factors, and the remainder was distributed based on the number of "units" of participation held by each equity partner, with such units reviewed and adjusted annually. *See Keegan deposition* at 15, 24-25. The Debtor did not report his income from MUS as wages or salary on his federal tax returns each year, but rather as income from a partnership. *See, e.g.*, Exhibit 13 (2005 tax return). The Debtor's income from MUS thus does not fit within the meaning of wages or salary as those terms are generally understood.

As to the *Friedman Memorandum*, the Debtor argues strenuously that the specific matter before that court was preliminary objections to the writ of garnishment that were filed by MUS, not a claim of exemption under *Section 8127(a)* by the Debtor. That may technically be true, but nevertheless it is clear that Judge Friedman was dealing with exactly the same issue as is presented here. MUS was claiming that the account was exempt pursuant to *Section 8127(a)*, just as the Debtor is doing here. Furthermore, while the Debtor himself did not formally file any preliminary objections, Judge Friedman noted that "his counsel have been involved in the arguments ... and have, at least orally, joined in the argument that his partnership account with [MUS] is exempt from execution." *Friedman Memorandum* at 4.

51

The Court may not be bound by the holding in the *Friedman Memorandum*, but that holding is certainly at least worthy of serious consideration. Having heard much the same arguments that the Debtor is making here, Judge Friedman concluded:

> It appears that the distribution of profit at [MUS] is performance-based and is for personal services rendered to the firm. However, that does not change the fact that it is still "profit." Section 8127(a) protects only wages, salaries and commissions. It is up to the Legislature, not the Courts, to decide if and when a liquidated or segregated interest in a partnership's profits should also be exempt from execution.

*Freidman Memorandum* at 9. This conclusion weighs in favor of Trizec's position in the present case.

Moving on from there (and apparently completely discounting the *Friedman Memorandum*), the Debtor states that there is no case decided under Pennsylvania law directly addressing whether draws, distributions or other payments made to attorneys in a law firm partnership are "wages" under *Section 8127(a)*. However, he does point to cases from New Jersey and Connecticut which, he argues, supports his position. The Court has reviewed those cases and does not find them to be compelling authority.

In *Zavodnick v. Leven*, 340 N.J. Super. 94, 773 A.2d 1170 (App. Div. 2001) the court found that a creditor's charging lien against a debtor's law firm partnership profits was subject to the limits of a New Jersey "wage" execution statute. However, since the "wage" statute in question also included "profits due and owing," which was critical to the court's decision, the court went on to state that "[a]lthough the distributions to Leven from partnership profits are not 'wages', they are unquestionably 'profits due and owing.'" 773 A.2d at 1175. Thus, *Zavodnick* does not help the

52

Debtor because, unlike the New Jersey law, *Section 8127* does not include profits.

The Debtor also relies upon *Caliendo v. Coassin*, 1994 WL 613380 (Conn. Super. 1994). In that case the court did find that the defendant's interest in the "profits and surplus" of a law partnership were "earnings" that were exempt from garnishment, but it did so only "[i]n the absence of any evidence as to the nature and terms of the defendant's partnership." *Id*. at *4. Here by contrast, the Court does have evidence as to the MUS partnership, including the fact that the Debtor was an equity partner in it, who was required to maintain capital in it, and where profits were distributed not based exclusively on time billed.

In the last of these non-Pennsylvania cases cited by the Debtor, *Fleet Bank, N.A. v. Blume*, 1993 WL 427346 (Conn. Super. 1993), while the court did make a comment that might be viewed as favorable to the Debtor's argument here, such was merely dicta because the actual holding in the case was that Connecticut law did not allow the creditor a prejudgment garnishment remedy against a partnership interest of the defendant.

The Debtor also relies heavily upon *Bell v. Roberts*, 150 Pa. Super. 469, 28 A.2d 715 (1942). In *Bell*, the court held that an attorney fee which was owed to a judgment debtor /individual practitioner attorney by his client constituted a wage or salary within a statute exempting wages or salary from attachment in the hands of an employer, the client being found to be the employer of the attorney. The Debtor contends that if he were a solo practitioner, rather than a partner, then on the strength of *Bell* his income would clearly be wages and protected by the *Section 8127(a)* exemption. He implicitly asks why the result should be any different merely because he is a partner in a firm. The Debtor, however, voluntarily chose to practice law as part of a partnership, presumably because

53

he believed there were benefits in doing so.  One cannot choose to accept the benefits incident to a particular form of business entity, and then brush aside that form when it works to his detriment. *See, e.g., Sams v. Redevelopment Auth. of City of New Kensington*, 431 Pa. 240, 245 (1968).

The Debtor has therefore not persuaded the Court to depart from the plain language of the exemption statute to somehow transform funds in the partnership account to "wages."  The Court would further note that since the Defendants filed their proposed findings and conclusions there <u>has</u> been a case decided under Pennsylvania law finding that a partnership account is not protected under *Section 8127(a)*.

In *Titus*, *supra*, the debtor claimed an exemption in $74,412 being held in a capital account at his law firm.  The debtor did so under *Section 8127(a)*, arguing that he was an employee of the law firm when the bankruptcy case was filed, and therefore the funds in the account constituted wages or a salary.  The trustee in *Titus* argued that because the debtor had formerly been a partner in the firm, and because the funds were still in a capital account, such money must constitute something other than wages or salary even though it was being held by an entity that was currently the debtor's employer.  The court stated:

> The Court agrees with the position of the Trustee and TRZ and will, therefore, sustain their objection to the Debtor's exemption of the $74,412 under § 8127(a). The Court rules as it does because it agrees with the Trustee and TRZ that, because such $74,412 still sits in a capital account at a law firm where the Debtor was once a partner, such money must constitute something other than wages or salary. Crucial to the Court's decision is its holding, in turn, that money which is earned by an individual in his capacity as a partner, as a matter of law, cannot constitute wages or salary. Because the $74,412 still sits in the aforesaid capital account, the Trustee and TRZ have preponderantly proven, that it is more likely than not, that such money represents either (a) a contribution that the Debtor made to the Schnader Law Firm when he was a partner there, or (b)

54

> earnings of the Debtor while he worked at such firm as a partner, which
> earnings were retained for whatever reason; neither of the foregoing, the
> Court holds, constitute wages or salary.

467 B.R. at 631.  Under this approach, since the Debtor in the present case was actually still a

partner when the bankruptcy was filed, then *a fortiori*, the funds in the MUS account would not be

wages or salary under *Section 8127(a)*.

The Court is, of course, not bound by the decision in *Titus* on this point.  However,

it adopts the same view for two reasons.  First, because  intra-court consistency is preferred where

possible.  Second, and more importantly, because the outcome in *Titus* as to this point is consistent

with the Court's own general view as to its role in statutory interpretation, which is what this issue

really comes down to.  When distilled to its essence, the Debtor's argument is that the Court should

find that the exemption applies despite the express language of the statute because that would

conform with what he perceives to be the spirit of the statute.  This Court, however, is bound to

follow the rule that when  the statute's language is plain, and where application of that language

does not produce an absurd result, the statute must be enforced according to its terms.  *See, e.g.,*

*Murphy v. Millenium Radio Group, L.L.C.*, 650 F.3d 295, 302 (3d Cir. 2011).

The Court is not unsympathetic to the Debtor's position.  No doubt the Debtor

worked hard for the funds in the account and truly views them as equivalent to "wages" for that

work.  However, by the plain meaning of the statute the funds in question do not qualify for the

exemption.  The Court will thus sustain the Trizec objection and find that the Debtor is not entitled

to an exemption in these funds.  The Court does note, however, that the funds are not in the

possession of the Debtor or the Trustee, but rather (apparently) still in the possession of MUS.  Since

55

MUS is not a party to this action, the Court cannot order it to turn the funds over to the Trustee.  If

MUS will not do so voluntarily following this decision, it will be necessary for a turnover action to

be filed.


### *CONCLUSION*


For the reasons stated above, as to the Oberdick FTA, judgement will be entered in

favor of the Defendants as to all counts.  As to the *Objections* filed by Trizec, the objection related

to the MUS 401(k) plan will be overruled, and the objection related to the MUS partnership account

will be sustained.  An appropriate order follows.


Dated: March 26, 2013            Thomas P. Agresti, Chief Judge
                                 United States Bankruptcy Court


Case Administrator to serve:
    John Vetica, Esq.
    Scott Hare, Esq.
    Neil Levin, Esq.
    Debtor